sitting with us today. It's my pleasure, thank you. Our first case for argument this morning is Henry v. Reynolds. Ms. Levy. Ms. Loeby. Good morning, Deborah Loeby. On behalf of the Court of Appeals, I am pleased to serve as live test dummy for an unnecessary cadet training exercise involving anal and vaginal cavity searches. Plaintiffs have presented sufficient proof of a violation of their Fourth Amendment rights and they respectfully ask this Court to reverse the summary judgment order denying their claims. I'd like to begin by discussing the nature of prisoners' Fourth Amendment rights. I know that defendants have cases like Kennedy and Peckham that prisoners do have a narrow Fourth Amendment right with regard to strip searches. It's assumed to be the case in Bell and it's been acknowledged by every other circuit that's ever considered the issue that prisoners do in fact have. Except this circuit, you say. This circuit has acknowledged it in both. We do have precedent which is rather adverse to your position, counsel. Yes, and I'm aware that you in particular, Judge, expressed... No. I'm sorry. It doesn't make any difference who is on the panel. We have precedent adverse to your position. Absolutely. I would love to discuss that precedent. I'm sorry, sir. I know that in Johnson and Phelan, Johnson versus Phelan, the court discussed distant cross-sex monitoring and discussed the opinion that Hudson extinguished prisoners' Fourth The court looked at whether there was a legitimate penological concern, a legitimate necessity, institutional necessity, that would trump prisoners' rights. And the court came to the conclusion that when there is a security or a safety concern, those sorts of concerns are going to trump prisoners' rights. Now that case was reconciled with Kennedy versus Boardman, which held the opposite, in Peckham, which then concluded that prisoners do have some rights. The issue really is whether or not there's an institutional need. And in both Johnson and King, which is also adverse to us, there was an institutional need. There were safety and security concerns, but this is not that case. In this case, there are no safety concerns, there are no security concerns to weigh against the violation, the extreme violation that occurred here. And that's what makes this case different from all of the adverse precedent that has come down in the Seventh Circuit. The Seventh Circuit, to be sure, has acknowledged the right but has also circumscribed that right, has questioned the right. It has been all over the map. But in the cases that have questioned whether or not prisoners have a Fourth Amendment right, each of those cases have questioned it because the institutional safety and security need trumps the prisoners' individualized privacy rights. In this case, you have a very unique fact pattern. Ms. Loeb, isn't that, but aren't you putting the cart before the horse? It seems to me that what you're arguing is about how the court should balance the needs of the institution versus the privacy rights of the individual prisoners. But don't you first have to establish what the reasonable expectation of privacy is in the first instance? Well, Belvey-Wolfefish tells us that that's how you define, that's how you figure out whether or not there has been a Fourth Amendment violation. In looking for the Fourth Amendment violation, you weigh the nature of the intrusion, the extent of the intrusion, against the institutional necessity. And that's where the Fourth Amendment violation comes from. When you have no institutional need, when you have a prison doing it for sport, or a prison doing it for random reasons, or like here, prisons doing it for having live human guinea pigs that are wholly unnecessary to institutional policy, then that gets weighed against the level of intrusion. And in this case, I dare say this is the most egregious intrusion strip search case that I've seen come out of the Seventh Circuit. This is one with really horrific intrusion facts to weigh against zero institutional necessity. You have several different defendants admitting that the sole and exclusive purpose for these strip searches was cadet training. Counsel, if you're right about purpose and the effect, you should have won under the Eighth Amendment. But I don't understand you to be appealing from the verdict under the Eighth Amendment. I assume you made a Rule 50 motion for judgment as a matter of law. The Eighth Amendment claim is different, Your Honor, because the Eighth Amendment claim, to be sure, there are overlaps sometimes. When nudity is used to humiliate a prisoner, then you have the possibility of an Eighth Amendment claim. But when you have a claim, you can have Fourth Amendment claims that deal with... When you have the infliction of gratuitous punishment on prisoners, you violate the Eighth Amendment. But I just want to be sure that I am understanding your position correctly. I do not understand you to be appealing from the verdict of, say, a Rule 50 motion under the Eighth Amendment. That's correct. We are not appealing the Eighth Amendment claims. The Fourth Amendment claims are different. For instance, the Fourth Amendment, very importantly, looks at not just whether or not the search can happen, but the manner of the search in which it entailed. And it falls under the analysis of Belvey-Wolfish as to whether or not the nature of the intrusion is the same. So you can imagine a number of situations where you may have a Fourth Amendment claim, but not an Eighth Amendment claim. Was there any touching or physical contact with the prisoners? The prisoners were forced to have physical contact with one another. They had a prolonged period of nudity. They were not touched by the guards, but they were forced to touch one another. They were forced to touch one another's menstrual fluids. They were forced to... They were in a situation where they spent a significant amount of time without products of menstruation. They had to display their menstrual products to the prison guards, and then they had to stand in the bodily fluids that they had left amongst each other. And they were forced to touch one another in close confinement. How long were they out there? The searches themselves, where they were standing together to be searched, were around 15 minutes. But there were hours from which they were dragged by the tactical team in the riot gear. They were brought in. They were stripped. They were made to stand for hours without bathrooms. That was my question. Bathrooms. They went without bathrooms for hours, Your Honor. And so there were bodily fluids. There was urine. There was menstrual fluid. There's no question about it. That's why I'm just curious to what extent the guards were involved in physical contact with each other. And I know displaying... This is not pretty. There's no question about it. This is not pretty. I mean, for millennia, women were taboo. It's something that's awkward to stand in an open courtroom with all these people and discuss. It is so taboo in our society, and yet these women were forced to display and to touch one another's fluids. That is as egregious a search as imaginable. And it gets weighed under belly woolfish against the institutional need. And that's inescapable. That's the Supreme Court test tells you that you weighed against the institutional need. And we have very clear testimony here. We have the warden herself saying there was no reason for this except cadet training. We have several other prison officials saying this was exclusively about cadet training. These were human guinea pigs being used to train cadets. And that takes it outside of the cases like King and against an actual institutional need for safety and security. And that's why it's so important that you preserve the Fourth Amendment in addition to the Eighth Amendment, because claims like this may not fall under the Eighth Amendment. The prison may have thought they had an institutional justification, but you as the court can tell them, live human guinea pigs is not a legitimate institutional justification, especially for a training exercise that is routinely done in the classroom, done just as effectively in the classroom, and does not need to be done with live human guinea pigs. What did, what did, what was not resolved in the Eighth Amendment claim? The Eighth Amendment claim dealt with strictly the Eighth Amendment, whether or not there was an intent to humiliate the prisoners. And so, and that claim was rejected. But that doesn't answer the question of whether or not this was an illegitimate search, nor, and whether the claims were not answered by the Eighth Amendment case. In Belle v. Woolfish, at least my reading of the case, was that there the Supreme Court assumed that convicted individuals had retained their Fourth Amendment rights. And that, and that from that analysis, the court then did the balancing of the institutional need versus what those some reasonable expectation of privacy under the Fourth Amendment for the interior of one's body against bodily intrusion, notions of bodily integrity. With regard to body cavity searches, here, I don't think there's any facts that would support the notion that the guards themselves did the body cavity searches, but had they done body cavity searches, would that have brought this case within the holding of the sparks? Respectfully, they did do body cavity searches. These women were forced to bend over, to spread their labia, to spread their butt cheeks, and to show their anal and their vaginal cavities for display. They had body fluids dripping from them. They were forced to remove tampons from their internal body and display those menstrual fluids. There's no different from being forced to do that and being forced to show your urine. These were internal, while not tactical internal, they were visual internal searches of women's internal body parts. These are not parts that are shown publicly. These are the most private parts that we have, and they are internal to our body, and so I think it falls within that. In addition, Your Honor, is there any protection at all under the Fourth Amendment against unreasonable searches and seizures? Although we acknowledge the tension between Johnson and Kennedy, we think the answer is yes. There is a Fourth Amendment right. It has been questioned how limited it should be. It has been questioned that it must defer to prison ideas about safety and security are going to trump the individualized suspicion need, so there's not a need for individualized suspicion when you have a security concern, but it does exist, and it's very important, and this case provides the absolute situation why it's so important to preserve the Fourth Amendment right, because you have a prison that has a farcical need. It's the flimsiest of need and the most egregious of violations. Did this institution have a similar, whatever you want to call it, with the male prisoner? This was a female prison only. Well, I don't know how to compare it. I'm sorry, are men subjected to similar searches? I know that there are lawsuits pertaining to violations. I mean, sometimes these searches are done poorly. In this case, they were done in a derogatory way, and that happens in the men intentionally shaming and dehumanizing the prisoners, and that happens in both situations. So it's not a distinction between men and women then? There's no equal protection claim in this case, but there has to be an institutional need. If they were doing it for safety concerns or security concerns, that gets weighed differently than when you have a situation here where they're doing it just to have live human guinea pigs. They ordinarily taught this in the classroom. There was no difference between the cadets who learned in the classroom and the cadets who learned it on live guinea pigs. The only difference was the severe trauma that these women had to go through in a training exercise that was completely extraneous. So it does happen in the men's prison. I believe our law firm litigates it in that context as well, but the important issue that this court needs to resolve this morning is the contours of the Fourth Amendment in the context of prisoners. And I think the court, while there have been some cases and some concurrences that have questioned whether or not prisoners have any Fourth Amendment rights, I think it's clear that any case that has questioned whether or not prisoners have Fourth Amendment rights is doing so in the context of which is still following Belle v. Woolfish. When you have no institutional concern, when you have no valid institutional reason for conducting the search, you have a very different equation. And there is significant case law, Kennedy in particular, but also Peckham, that does say there is a Fourth Amendment right. Do you have any comment on the Supreme Court's opinion last term in Manuel, which said the Fourth Amendment rights drop out on conviction, that the Fourth Amendment lasts until the date of conviction but then stops? You know, Manuel wasn't raised in this case. I know it wasn't raised by the parties. I'm asking if you have any comment. There have been a number of cases of which we cite that say the Constitution doesn't drop off as soon as you go into the prison. Counsel, I'm asking about Manuel. If you're not prepared to discuss it, that's fine. You can just say it wasn't relied on by the parties. But it is the Supreme Court's most recent decision that seems to bear on this topic. And it does say that the Fourth Amendment drops out on the date of conviction. I'm not prepared to discuss Manuel in particular. I will say, however, that the Fourth Amendment, even if prisoners don't have a right to contest the fact of the government snooping, there still has to be some guidance on the nature of the manner in which the search is held. For instance, I think we could all agree that if prisons were to say, let's just have everybody go naked and that will solve our contraband problem, that that would have a right to search. It may have a right to strip search. We are not contesting whether or not prisons can strip search prisoners. Absolutely, there are contexts in which they can. But they still have to do it in a manner that is constitutional and that is precedent in this circuit, plus Manuel. Yes. First of all, with qualified immunity, as with the argument about what the defendants have conceded that prisoners do retain a Fourth Amendment right, their brief concedes that throughout, they never raise qualified immunity. I wish you would address my question rather than some other question you wish I had asked. I'm sorry. No, I'm trying to speak to forfeiture, Your Honor. I believe the qualified immunity argument has been forfeited. But I also believe that Kennedy made it very clear that prisoners have Fourth Amendment rights and that the manner of search must be constitutional. I believe that Bell and Peckham reiterated this right, made it clearly established law. Johnson, while went the other way, was not abrogated and that was very clear in Peckham, which addressed Johnson directly. And King was a very fact-specific case that came after this. So the only contrary case you have that came before this is Johnson. And Johnson was addressed directly in Peckham and it was resolved in Peckham. With the conclusion that prisoners do retain a Fourth Amendment right. So I don't believe we have any qualified immunity problem, but it is also forfeited. I see I'm running into my rebuttal time. So unless there are further questions, I'll reserve what I have left. Certainly, Ms. Lobey. Thank you. Ms. Welch. Good morning, Your Honors. May it please the Court, I'm Mary Welch. I'm here on behalf of the defendants. And I wish you would start where this previous argument ended. It seems that you did not argue qualified immunity in the district court. So why should we entertain your argument now? Well, I think it's invited by the district court's decision in that it construed plaintiff's argument to say they want to change in the law. And if you want to change in the law, then it means that the law can't be clearly established in their favor. I mean, just as a matter of logic. And then plaintiffs also, at least in their opening brief, indicated that there needed to be a change in law. And so that because the question was, was there any sort of, did this court alone say that there was no Fourth Amendment right? Where in the district court's opinion did the district court invite a qualified immunity defense that the district judge then proceeded to ignore? I mean implicitly for us to address the district court's decision. Where did the judge do this implicitly? Can you point to some place? Yes, when the court said that what plaintiffs want is a change in the law. A change in the law means that the law can't be clearly established in their favor. For them to win, if they can win only through a change in the law, it means that the law cannot be clearly established now in their favor. And I would like to say that contrary to plaintiff's view, this court isn't really all over the map about what the contours of the Fourth Amendment rights are, rights is to bodily integrity in a prison. There are only three exceptions to, there were only three circumstances in the case law from the Supreme Court and this court that would allow finding of a Fourth Amendment violation. One is, as the court indicated earlier, when there's a physical invasion of the prisoner's body. There was no, plaintiffs have conceded, there was no physical invasion, no finger of a guard went into any orifice, there was no touching even of a guard, of a shoulder, of any inmate who was unclothed. The other one is, there are two others, the one is, I'm sorry, one is when there's the significant, well first, and so this means that there's a significantly lessened privacy interest for inmates as opposed to, you know, plaintiff's brief is full of detainee cases and arrestee cases, an arrestee who was made to strip search in the backyard of his house with all his neighbors looking, that's not this case. You know, when you go to a prison, the Supreme Court, this court have been very clear that there is extremely little privacy interest that remains with you. It's not none, but there's almost none. And the only cases that have found this is when there's no security interest, as plaintiffs have argued, but when there's no security interest, there's always a security interest in contraband. They, you know, before this, this search was requested months before it occurred because there had been an uptick in both assaults of prisoner on prisoner and prisoner on guards. It went from two a month, the assaults, to five a month. Ms. Walsh, can I ask a question regarding that? So you said that here the record establishes that there was no touching by the guards or digital penetration by the guards. If the guards had engaged in digital penetration of the orifices, would that then change the analysis? Would then there be a Fourth Amendment reasonable expectation of privacy against digital penetration in body cavity searches? I mean, I think this court has indicated that. I mean, again, it would depend, for example, if there were some sort of serious contraband that couldn't be- or whether the guard orders the prisoner to digitally penetrate the prisoner under the orders of the guard or otherwise face the consequences. Does that distinction matter? Yes, yes, it does matter. So I mean, because I kind of think about this and just by way of analogy. So if you have reasonable expectation of privacy in your house and the legal authorities bust into your house, right? But then there's another scenario where the legal authorities come and they ask you if they can come to your house and you say no. And they say, well, if you don't let us, then we're going to arrest you. We're going to detain you. We're going to have other consequences. Does that make a difference with regard to the initial analysis of whether or not the individual had reasonable expectation of privacy with regard to that area? Well, I think the reasonable expectation of privacy of a person in the home is not absolute, but almost. And so when they're invited in, of course, then you have no expectation. If you invite the police in, you have no expectation of privacy because you've given that up, right? And so, but if they say, I mean, usually what happens I think is when they say no. But here the prisoners were ordered, right? It's not like they had a choice. Oh, no, of course not. Of course not. But again, in case after case, for example, in Hudson, they say prisoners have a limited expectation of privacy in their unclothed bodies. And that limited expectation must always yield to the paramount security concerns. I mean, it doesn't, I don't think it means always, but when the security concern is valid, I think that's it. Because the kind of cases where a Fourth Amendment violation can be found are when, for example, the case, the Sixth Circuit case, in which there were three strip searches a day of the guys in segregation, where there was no possibility of a security concern because they didn't interact with anyone else. They didn't have, they didn't, you know, have any objects that would come in and out of their cells. They were alone in their cells. They couldn't, they had no opportunity to have contraband. Also, there was the other case, the May case, this court's case, unpublished, where there was a second search. They had searched the guy once, and then they searched him again immediately. Again, there couldn't have, there was, there were, the prison officials were unable to articulate a reason for the second search. There was no question about the first search, but there was a question about the second search, both because it was the second search and they had already searched the guy, and also because it was done in front of women visitors who, you know, who had no business, you know, being allowed to see this. So, so those, those sorts of facts, those are the kinds of facts that, that would allow a Fourth Amendment violation to be found. That's, that's the, that would violate the extremely, you know, limited expectation of privacy that prisoners have. I mean, it's, it's, you know, it's hard for us to imagine. I mean, certainly, you know, the bailiff couldn't come and undress me standing here. I mean, that would be an obvious Fourth Amendment violation, or, you know, order me to disrobe, unless I was waving a gun, maybe. You know, I mean, the circumstances really change. And here, although plaintiffs say that these, you know, that the prisoners were guinea pigs, that there was, this was frivolous, I mean, that's simply not true if you read the, if you read the record. When you read the record, you see that Reynolds felt that, you know, Reynolds had seen an uptick in assaults and in contraband. The contraband since September, the prior September, had gone from 102 incidents to like 180. I mean, there was a serious, and also the assaults had almost doubled. So there was a serious concern that things were getting a little out of hand. And remember, searches aren't just to find contraband. Searches are to deter people from having contraband. Did they find contraband in this search? I'm sorry? In this whole episode, did, was, did they find contraband? They did. They found a lot of contraband in the cells, and they found, they did find contraband inside one woman's vagina. They did? Yes. Obviously, if they're out of the cell, you know, that's a difference. You can do that anyway. But that was what I was wondering. And also with the, I don't know how to describe it, where they are touching one another. Well, they were just grazing shoulders, they said. It's not as though they were touching each other's breasts or their buttocks or their- Well, that's what we just heard. Supposedly, in spreading the buttocks, et cetera, somebody else is doing it? No, no. They're doing it themselves. No, no, no. Okay, so there wasn't- Each inmate touched herself. There wasn't any other interaction- No, no, no. Of course, by, directed. All right, because I think that's important. Yes, it is. It would be, I think if, for example, there had been, there was evidence that one inmate was ordered to, you know, digitally invade the anus of somebody or the vagina of somebody, you know, another inmate, that would be a serious, you know, that likely would be a Fourth Amendment violation. But that's not this case. You know, what happened was there was a small space, there were supervisors who were, there were the cadets and there were the supervisors. And so, you know, so the inmates were, they took off their clothes, they were in close quarters, but they were not, they certainly were not touching each other's, you know, breasts, buttocks, vaginas. Was this one at a time going through the ranks and with a guard looking? Yes. I mean, my understanding, it's a little vague even from the affidavits, which are highly detailed, but it appeared that, you know, they took between four and ten maybe in a group. Why is this vague from affidavits? There was a trial. Why don't we look at the trial record to see what happened? Well, I don't think we can because we're on summary judgment. So we can only look at the record. There was a trial on the Eighth Amendment claim. That's true. Why don't we know exactly what happened? Because on the appeal from summary judgment, we can only look at the record that was right before the district court. The trial is in the record of this case. We can look at it. I don't think you can look at it to decide this case. Yes, we can. We know what happened. Why don't you tell us what the trial record says about what happened? Your Honor, I haven't read the trial record. Oh, boy. But in the... You're arguing this case to us and you haven't read the trial record? I read the... This is stunning. ...summary judgment record, Your Honor, because that's the only thing that was before the district court when it decided the summary judgment motions. I mean, the... But again, the extremely limited privacy rights of prisoners are invoked only when there's a bodily touching, as we've said, and also there is an exaggerated response to a security concern. And I go back to the evidence of the security concern. Months before, as we said, months before the search took place, Reynolds just saw the uptick in assaults, saw the uptick in contraband, got approval from Warden Hewlett to augment his staff with the cadets. And this is a critical question, as the plaintiffs say. What happened here is that this prison wanted to do a mass shakedown. You can't do that with the prison staff that you have. You can only do that because you have only a few hours and you have limited staff to do it. So, for example, when they had the TAC team do it, do a prior search, they only had four hours, so they could only do some people and they could only do pat-downs. What they wanted to do was an extremely thorough search given this uptick, so they needed more bodies. They knew that every class does searches. Every class does physical searches twice. They do a physical search of one of the high security prisons, that's the sixth week, and they do a search of another prison in the fifth week. They chose this prison, they agreed, the Academy agreed to do this prison because Reynolds had said, we need this, we need a serious mass shakedown. There's been an uptick in assaults and there's been an uptick in contraband. I think you said, as far as these, I'll call it the physical search as opposed to the one where they're out of the cell, they find other contraband. I think you mentioned that in at least one, maybe two or three or four, in the, whatever we want to call this type of search, they did find stuff. They found, in one woman's vagina, medication was found. She, in herself, removed it. The staff did not touch her. That's also very clear from the record. And it was clear from the record on summary judgment. Yes, correct. As opposed to the trial. Again, I have not read the trial record. Well, I mean, you know that, and you didn't look at the record on the trial, but you know that from the summary judgment. Right, I know this from summary judgment, yes, yes, yes. So again, because there had been this uptick, the uptick in both assaults and contraband being found, a dramatic uptick, really, almost double for both, the prison, Lincoln Prison, felt that they needed to have the mass shakedown. So it's completely wrong to say that this was frivolous, that they were guinea pigs. What the cadets did was provide people who could, you know, additional staff to do the searches. Because even with the additional cadets doing the searches, it's still the whole process took six hours. This is, you know, again, a mass shakedown is a routine thing at a prison. You always have to be concerned about contraband, and you always have to be concerned about violence. People might have shivs and so on. The search was the whole population of the prison? It was two of the housing units. There were 1,000 women altogether in this part of the prison, and 200 of them were searched. So is that a separate? There were two housing units. They have like five housing units, and there were two parts of a housing unit. So there were two housing units in the same room? Yes, everybody was put in. The 200 people were all taken to the gym, yes. There were 200? Right. Yeah, that's undisputed, certainly. So they were there. They went there. They were taken in groups, again, to do it quickly, because it could have taken days otherwise. And the evidence, this is stated in the record, it would have taken days to do it with just the prison staff itself. So that's why, knowing that they do these, that the classes do two searches at the end of every group of new incoming cadets, the prison asked to have it be the one that was chosen. What did the staff do? I'm sorry? If you've got, I guess the only way I can put it is they're examining themselves, spreading and doing various other things. What did the staff do? Did the staff watch? Well, the staff had to observe to see if anything. So they're standing close by and this is happening? Yes, yes, because they're doing the search. I mean, the search is the observation of the body. So they go from one to the next to the next, I guess. Correct. And each one goes through that procedure. Correct, correct. I mean, they were taken into. Without them touching them. I'm sorry? They're telling them what to do without touching them. Correct, correct. They were taken in groups of four to ten about to either the bathroom off the gym or the beauty shop off the gym. And then they were told to disrobe. They were told to lift their breasts, go through their hair, spread their cheeks, spread their labia. Now, wait a minute. You're saying that each individual, they're going to go into a bathroom and do this particular thing? Into like a group bathroom. These are big group bathrooms. I'm just looking at it because I would sort of stress that they're up there four hours without a bathroom. Well, right. Yes. I mean, it does. I can't explain that. I mean, they were in the bathroom. Yeah. Well, half of them say or a good portion of them were searched in the bathroom. And it's a communal bathroom. And remember, too, this is, you know, Lincoln in particular, there's even less expectation of privacy. They have a one great big shower. They had great big shower rooms, 15 shower heads. No stalls, no shower stalls, certainly no curtains on shower stalls, and no doors on the toilets. So if you were menstruating, you know, your fellow inmates knew, sister inmates knew that you were menstruating. I mean, there really was no, I mean, even though in, you know, in this building it would be private, in a prison these things are not private. So, Ms. Walsh, you stated that if there was digital penetration or physical touching, that the prisoners would likely have a Fourth Amendment case here. Well, they would have stated one. Let me say that. Right, right, right. They would have a reasonable expectation of privacy claim. So a guard then, if a guard orders a prisoner to spread her labia and to move her breasts and do it herself, there's no claim. But if, what if the prisoner refuses? And then the guard then has to do it. Does then all of a sudden, does a Fourth Amendment claim then rise because of the prisoner's refusal? And so it just seems odd that in such an instance, whether or not there is a Fourth Amendment claim, so a prisoner, if she complies, wouldn't have a Fourth Amendment claim. But if she didn't, she would have a Fourth Amendment claim. That seems like a peculiar line to draw. Right. I mean, I understand. I don't know of any prisoner who has ever refused. I mean, certainly it didn't happen in this case that any prisoner that refused to do that. I mean, I know that there are instances in which. But I guess my point is that whatever right, limited expectation of privacy, the prisoner may have with regard to the prisoner's body cavity, it seems odd to make that right either exist or not exist, depending upon whether the prisoner decides to refuse or to refuse to comply and then have the guard do it or the prisoner then complies and does it herself. Well, the solution to that might be that, for example, they would take the prisoner to the medical care area and X-ray them to see if there's a telephone. Or I think I heard that there was a program where someone brought a gun in the body cavity into a prison. I mean, these things happen. And so as far as I know, they would probably take them to the health care unit to X-ray them to see if there was something. I see my time is up. Unless there are questions, we ask that the court affirm the summary judgment in favor of the defendants on the Fourth Amendment claim. Thank you. Thank you, Ms. Welch. Ms. Loewy, anything further? Yes, sir. Thank you. So the parties agree that prisoners do have a limited Fourth Amendment right and that a Fourth Amendment violation occurs when there's an exaggerated response to a security threat. The manner of the search is important in this analysis, and I just want to clear up just a few of the points that you were questioning about. There were men who were watching these searches. There was definitely a civilian who was watching while they occurred in the bathroom. Exactly. Look, that's why I've been asking continually about the Eighth Amendment. What we've held, and I'm just quoting now from King, that there's a claim under the Eighth Amendment if the strip search in question was motivated by a desire to harass or humiliate rather than by a legitimate justification such as the need for order and security in prison. That sounds exactly like what you're now saying is the Fourth Amendment standard. But it's the Eighth Amendment standard in this circuit, and I don't understand why this isn't the argument we're having about whether you win under the Eighth Amendment. Because under the Fourth Amendment, the question is whether or not the search, the nature of the intrusion, is justified by the institutional need. Now, the only way that counsel was able to get around that was to stand up and argue the facts. She told you that somebody said there was a security problem, that there was an uptick in crime, that something was found, that you can't retroactively justify because one tablet was found in one woman's vagina, that the search was legitimate. They have to have a reasonable basis for the search in order to do it. And you have the warden herself being asked, can you think of any reason other than the training of cadets that you ordered a shakedown in the Lincoln facility? Answer, I cannot. That sounds like the basis of an Eighth Amendment claim under this circuit's precedent. It's completely sufficient for an Eighth Amendment claim. I was stunned that your adversary hasn't read the trial record. I'm stunned that you're arguing the Fourth Amendment rather than the Eighth. It looks to me like if your story about what happened is correct, you have a slam-dunk Eighth Amendment case. Respectfully, Your Honor, both parties agree that when there's... And I assume you argued this to the jury in the Eighth Amendment, in the Eighth Amendment trial. If I may argue this distinction, please. Both parties agree that when there's an exaggerated response to a security threat, then there is a Fourth Amendment violation. My opposing counsel just stood up and acknowledged the same. When you have that situation, you have a Fourth Amendment violation. I have transcript after transcript that I can read you of Defendant Hewitt, Defendant Zerkovich, and Defendant Zavala all saying this wasn't about security. There were no security concerns. This was purely a cadet training exercise. Exactly. This was human guinea pigs. Which is why I don't understand why you have abandoned your Eighth Amendment claim. Regardless of... There we are. Thank you very much. Regardless, we've asked you... Thank you very much. Thank you, Your Honor. The case is taken under advisement.